2009 ND 86

Scott **NEUHALFEN**, Claimant and Appellant

v.

**NORTH DAKOTA WORKFORCE SAFETY & INSURANCE FUND, Appellee**

and

**Marketplace Foods, Respondent.**

No. 20080175.

Supreme Court of North Dakota.

May 15, 2009.

Stephen D. Little, Dietz & Little Lawyers, Bismarck, N.D., for claimant and appellant.

Jacqueline Sue Anderson, Special Assistant Attorney General, Fargo, N.D., for appellee.

KAPSNER, Justice.

[¶ 1]  Scott Neuhalfen appeals from a district court judgment affirming a Workforce Safety and Insurance ("WSI") order requiring him to forfeit future benefits relating to his claim and to reimburse $11,500.47 for benefits WSI previously paid.  We conclude a reasoning mind reasonably could have concluded Neuhalfen made false statements sufficiently material to support both forfeiture of future benefits and reimbursement of benefits paid.  We affirm.

## I

[¶ 2] On March 30, 2006, Neuhalfen submitted a claim for benefits to WSI, asserting that he injured his lower back while employed as a baker with Marketplace Foods in Minot. Neuhalfen reported that while "reaching across a pallet to lift a case of frozen donuts to stock them," he "felt a pop in [his] lower back," which was stiff and swollen a few hours later. Neuhalfen received chiropractic treatment that day for low back pain. In Neuhalfen's first report of injury, he indicated he had strained his right lumbar spine. Neuhalfen testified that a representative from his employer's personnel department assisted him in filling out the injury report based on Neuhalfen's responses. On the injury report, Neuhalfen checked a box stating he had prior problems or injuries to that part of the body; however, below the checked box under a section entitled "Witness(es) to the Injury," Neuhalfen indicated "in upper back, not lower."

[¶ 3] On March 31, 2006, WSI accepted Neuhalfen's claim for "[l]umbar sprain and strain" and began paying benefits. A WSI claims adjuster testified she accepted the claim based upon Neuhalfen's injury report. According to the claims adjuster, after she began receiving treatment notes she decided "on a hunch" to check records from Neuhalfen's previous chiropractic treatment because chiropractors usually treat the "whole back, not just a specific part." The adjuster also said she wanted to make sure she had all the records. The adjuster testified that when she received records indicating Neuhalfen had previously received treatment for his lower back, she sought additional medical records, including records from other chiropractors identified in the notes. Those medical records reflected Neuhalfen had sustained injuries to his lower back in a motor vehicle accident in 1993. The claims adjuster testified that because she was aware of the prior car accident, she also requested prior treatment records from Trinity Hospital for that accident.

[¶ 4] In a July 13, 2006, letter, Neuhalfen's employer wrote to WSI questioning whether Neuhalfen's work injury was an exacerbation of a previous injury from the car accident. On July 19, 2006, another WSI claims adjuster spoke to Neuhalfen as a part of a "three-point contact," where contact is made with the claimant, employer, and medical provider. Neuhalfen reportedly told this claims adjuster that he had "no priors except many years ago with shoulder and knee but no permanent restriction or work loss" and that an MRI showed a herniated disc resulting from his work injury. On July 28, 2006, Neuhalfen had a video-recorded conversation with his claims adjuster. During the conversation, Neuhalfen offered to release any records regarding the car accident, and mentioned injuries to his head, shoulders, and knee, but did not mention any prior treatment to his low back.

[¶ 5] In mid-July 2006, Neuhalfen had a lumbar MRI scan on his back, which the radiologist concluded showed: "L5–S1 discal degeneration with eccentric left disk herniation partially obliterating the left lateral recess fat and extending into the left L5–S1 foramen. This would manifest as a left L5 and left S1 radiculopathy." On August 3, 2006, WSI issued a "Notice of Decision Approving Medical Condition," accepting liability for "[d]isplacement of lumbar intervertebral disc without myelopathy." WSI thereafter continued to receive medical records regarding Neuhalfen's prior medical treatment.

[¶ 6] In September 2006, WSI investigators interviewed Neuhalfen regarding his preexisting low back condition. Additionally, WSI's medical consultant, Dr. Gregory Peterson, reviewed Neuhalfen's

claim. Dr. Peterson concluded Neuhalfen had chronic neck and low back pain and memory complaints after his 1993 car accident and opined Neuhalfen's spine condition was preexisting and his work merely triggered his symptoms.

[¶ 7] On October 10, 2006, WSI issued a Notice of Intention to Discontinue Benefits, notifying Neuhalfen that he had violated N.D.C.C. § 65–05–33 by willfully and intentionally making material false statements for failing to disclose his prior treatment for his low back. The notice extensively detailed Neuhalfen's prior medical records in addition to addressing Neuhalfen's previous 1993 automobile accident, which had resulted in prior low back pain and treatment. Neuhalfen requested reconsideration. In December 2006, WSI issued an order denying Neuhalfen further benefits for willful false statements regarding his prior low back treatment and requiring him to reimburse WSI $11,500.47 for benefits paid from June 23, 2006, through October 31, 2006, based upon his false statements.

[¶ 8] Neuhalfen requested a formal administrative hearing, and a hearing was held before an administrative law judge ("ALJ") in June 2007. In September 2007, the ALJ issued recommended findings of fact, conclusions of law and an order. WSI adopted the ALJ's recommended decision as WSI's final order, finding Neuhalfen's false statements impeded WSI's determination of his eligibility for benefits and caused WSI to pay benefits for a preexisting low back condition relating to his prior motor vehicle accident. WSI's final order concluded Neuhalfen forfeited further benefits relative to his injury and required Neuhalfen to reimburse WSI for benefits paid based upon his false statements. Neuhalfen appealed WSI's final order to the district court, which entered judgment affirming WSI's order.

## II

[¶ 9] Courts exercise limited review in appeals from administrative agency decisions under the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32. *Fettig v. Workforce Safety & Ins.*, 2007 ND 23, ¶ 9, 728 N.W.2d 301; *Forbes v. Workforce Safety & Ins. Fund*, 2006 ND 208, ¶ 10, 722 N.W.2d 536. The district court under N.D.C.C. § 28–32–46, and this Court under N.D.C.C. § 28–32–49, must affirm an administrative agency decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

N.D.C.C. § 28–32–46. On appeal from the district court's decision in an administrative appeal, we review the agency order in the same manner. N.D.C.C. § 28–32–49; *Bergum v. North Dakota Workforce Safety & Ins.*, 2009 ND 52, ¶ 8, 764 N.W.2d 178;

*Bruder v. North Dakota Workforce Safety & Ins. Fund,* 2009 ND 23, ¶ 6, 761 N.W.2d 588.

[¶ 10] This Court exercises restraint in deciding whether WSI's findings of fact are supported by a preponderance of the evidence, and we do not make independent findings or substitute our judgment for that of WSI. *Renault v. North Dakota Workers Comp. Bur.,* 1999 ND 187, ¶ 16, 601 N.W.2d 580. We decide only whether a reasoning mind reasonably could have determined that WSI's findings were proved by the weight of the evidence from the entire record. *See Roberts v. North Dakota Workmen's Comp. Bur.,* 326 N.W.2d 702, 704–05 (N.D.1982) (citing *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979)). Questions of law, however, are fully reviewable on appeal from an administrative decision. *Stein v. Workforce Safety & Ins.,* 2006 ND 34, ¶ 6, 710 N.W.2d 364.

## III

[¶ 11] Under N.D.C.C. § 65–05–33(1) and (3), a claimant who "[w]illfully ... makes a false statement in an attempt to secure payment of benefits or payment for services" or who "[w]illfully misrepresents that person's physical condition" shall reimburse WSI for any benefits paid based upon the false statement and shall forfeit any additional benefits relative to that injury. To trigger the statutory consequences for the civil penalties in N.D.C.C. § 65–05–33, WSI must prove: "1) there is a false claim or statement; 2) the false claim or statement is willfully made; and 3) the false claim or statement is made in connection with any claim or application for benefits." *Fettig,* 2007 ND 23, ¶ 13, 728 N.W.2d 301; *Forbes,* 2006 ND 208, ¶ 13, 722 N.W.2d 536.

[¶ 12] For purposes of the civil penalties in N.D.C.C. § 65–05–33, this Court has defined "willfully" as "conduct engaged in intentionally and not inadvertently." *Forbes,* 2006 ND 208, ¶ 13, 722 N.W.2d 536 (citing *Dean v. North Dakota Workers Comp. Bur.,* 1997 ND 165, ¶ 15, 567 N.W.2d 626). "WSI 'must prove the claimant's state of mind was purposeful in making the false statement.'" *Fettig,* 2007 ND 23, ¶ 13, 728 N.W.2d 301(quoting *Hausauer v. North Dakota Workers Comp. Bur.,* 1997 ND 243, ¶ 12, 572 N.W.2d 426). A claimant's state of mind must usually be inferred from conduct and circumstantial evidence because a claimant's intent can rarely be proven directly. *Dean,* at ¶ 20.

[¶ 13] In addition to establishing a claimant's false statement is willful, WSI must prove a false statement is material. *Forbes,* 2006 ND 208, ¶ 14, 722 N.W.2d 536. Under N.D.C.C. § 65–05–33, this Court has established two separate tests to decide "materiality" for purposes of the civil penalty. When WSI seeks forfeiture of future benefits, a false statement or false claim is sufficiently material if WSI proves the claimant's statement "could have misled" WSI or medical experts in deciding the claim. *Fettig,* 2007 ND 23, ¶ 13, 728 N.W.2d 301. However, when WSI seeks reimbursement of benefits paid, WSI must prove the false claim or false statement actually caused the benefits to be paid in error. *Fettig,* at ¶ 13; *Forbes,* at ¶ 14. This Court will affirm WSI's findings under N.D.C.C. § 65–05–33 if they are supported by a preponderance of the evidence. *Forbes,* at ¶ 14.

## IV

[¶ 14] Neuhalfen argues WSI failed to show by the greater weight of the evidence that he made willful and material false statements regarding his prior medical condition and treatment.

## A

[¶ 15] Neuhalfen claims that any potential false statements made by him were not material because he had no knowledge of his preexisting degenerative low back condition and his work-related injury would have been compensable under N.D.C.C. § 65–01–02(10)(b)(7), because his employment substantially worsened his condition. Neuhalfen asserts that although WSI's medical consultant, Dr. Peterson, opined that Neuhalfen had preexisting degenerative disc disease and his work injury was merely a "trigger," Neuhalfen had no knowledge of any degenerative disc disease or herniated disc prior to the work injury because he believed his "occasional low-back pain" was muscular in origin. Neuhalfen further argues that even if he "mistakenly neglected" to inform WSI of his prior car accident, it is of no consequence because he was not aware of any such preexisting condition nor did he misrepresent that preexisting condition to WSI. Neuhalfen also asserts he did not read or fill out any relevant forms, but instead these forms were filled out by his employer's personnel director or by his wife.

[¶ 16] WSI's final order, however, made the following factual findings:

2. On July 13, 2006, the employer wrote to WSI and questioned whether Mr. Neuhalfen's work injury was really an exacerbation of a previous back injury that Mr. Neuhalfen received in a car accident.

3. On July 19, 2006, WSI personnel spoke with Mr. Neuhalfen regarding his back injury. He said he had a car accident fifteen years ago "causing head injury. He states his memory is bad." ... He "states no priors except many years ago with shoulder and knee but no permanent restriction or work loss."

... He said an MRI showed a herniated disc resulting from his work injury.

4. On July 28, 2006, Mr. Neuhalfen stopped at WSI to drop off some tax records. He met with [his claims analyst]. Mr. Neuhalfen asked whether his employer was fighting his claim and he addressed issues identified by his employer. Mr. Neuhalfen raised the issue of his prior injuries, stating "as far as my prior injuries go, to a car accident. I can release all the information you guys would ever need on that. It wasn't anywhere's [sic] regarding or near this injury at all." Mr. Neuhalfen said that he had injuries to his head and shoulders and that he had a prior knee problem. He did not mention any treatment to his low back. Mr. Neuhalfen gave the impression that his current low back condition was unrelated to the car accident. Mr. Neuhalfen said that he would release any records related to the car accident, but Mr. Neuhalfen's offer, made to persuade WSI that he was forthcoming, must be evaluated in light of the fact that he had already made a false statement on his claim form and that false statement was now an issue.

5. On August 3, 2006, WSI accepted liability for displacement of the disc. At that time, [his] claims analyst, was aware that Mr. Neuhalfen had been treated for prior low back pain, but the evidence does not show that she was aware that Mr. Neuhalfen had a preexisting herniated disc. Mr. Neuhalfen had reported that his herniated disc was from his work injury. And while chiropractic records dated January 4, 2000, state that Mr. Neuhalfen had a herniated disc, the records indicate that they were faxed from Chiropractic Associates on August 4, 2006, the day *after* WSI accepted liability for the herniated disc.
....

[¶ 17]   WSI found that Neuhalfen has a "long history of preexisting low back pain and treatment stemming from a December 6, 1993, car accident." Based on Neuhalfen's medical records indicating prior treatment, WSI found Neuhalfen continued to complain of low back pain in 1995, and again in 1996, which he attributed to the car accident. Again, in early 2000, after shoveling snow, Neuhalfen sought chiropractic care and reported constant back pain and intermittent low back pain, and WSI found Neuhalfen "reported having a herniated disc." WSI found Neuhalfen also reported low back pain after unloading equipment in April 2001, reported left lower extremity pain in May 2001, and low back pain in August 2002. In September 2004, Neuhalfen again sought chiropractic treatment after walking a trail at Mount Rushmore, complaining of primarily low back pain. WSI found this chiropractor indicated that "in light of the disc symptoms, he was going to treat the low back pain as a disc herniation." WSI made the following findings of fact:

11.   On September 27, 2004, Mr. Neuhalfen saw Dr. Travis Roedocker, D.C., and complained primarily of low back pain after walking a trail at Mount Rushmore. He had pain down both legs to his mid-thigh. He reported that he had hurt his back in a car accident in the 1990's. His pain was localized to his low back. He followed up with Dr. Roedocker on September 28 and 29. Dr. Roedocker advised that in light of the disc symptoms, he was going to treat the low back pain as a disc herniation. On September 30, 2004, Mr. Neuhalfen saw Dr. Mehta. He complained of low back pain with radiation to his lower extremities, more so on the right. Dr. Mehta diagnosed a muscle sprain and possible degenerative disc disease. Mr. Neuhalfen had physical therapy and followed up with Dr. Mehta on October 7, 2004.

He still had low back pain. An x-ray of the lumbar spine was normal. All discs were preserved. On October 27, 2004, Mr. Neuhalfen saw Dr. Ray and reported continued pain in his left low back.

12.   On March 30, 2006, Mr. Neuhalfen saw Dr. Jason Brintnell, D.C., for low back pain. He reported that this current pain resulted from a work injury that had occurred that morning when he was unloading a pallet. He felt pain in his right lower back and now had shooting pain into his buttock and posterior thigh. Dr. Brintnell diagnosed moderate lumbar sprain/strain with an acute inflammatory response, muscle spasm and segmental dysfunction. That same day, Mr. Neuhalfen filed a claim for workers compensation and reported that he had problems with his back before, but "in upper back, not lower."

13.   On June 6, 2006, Mr. Neuhalfen saw Dr. Mehta. He complained of back pain and "report[ed] that he had past history of motor vehicle accident and for that he had a back pain too." ... He reported more pain on the right side radiating to his lower extremities. Dr. Mehta assessed a neuromusculoligamentous sprain, acute back pain and muscle spasm. Mr. Neuhalfen was prescribed therapeutic exercises. On June 8, 2006, Mr. Neuhalfen reported that his pain was down to a "4 or so." ... On June 16, 2006, Dr. Mehta noted that Mr. Neuhalfen had "a lot of degenerative disc degeneration in the L5, S1." ... Dr. Mehta prescribed exercises and a lumbosacral corset. On June 30, 2006, Mr. Neuhalfen again complained of severe low back pain, now more on the left side and in both legs. On August 11, 2006, he reported more pain on his right side, and on August 22, 2006, he reported more pain on his left side. This is the same low back pain that he complained

of following his motor vehicle accident in December 1993, and the same pain with radiation that he has complained of since that accident.

14. On September 7, 2006, WSI investigators interviewed Mr. Neuhalfen regarding his preexisting low back condition. Mr. Neuhalfen was asked about his car accident. He said he had an upper back injury, a head injury, and he was still having problems with his shoulders. He agreed that on his first report of injury he reported that he had prior injuries to his upper back, but not his low back. When questioned further, Mr. Neuhalfen indicated that he meant his low back pain wasn't as severe before, "I've made it from '93 'till this latest injury being able to work." ... Then, Mr. Neuhalfen said that this injury is different because "I've never had a herniated disk in my lower back." ... When confronted with the medical records, Mr. Neuhalfen admitted that he had preexisting low back pain "but it was all muscular according to the other doctors." ... When asked why he would state something else on the claim form, he said, "it probably escaped my mind with all the problems that I've had." ... Then he said, "I didn't figure it was important, you know I figured I was going to the chiropractor, they were going to fix this." ... Mr. Neuhalfen can't have it both ways. He can't forget his preexisting low back condition and at the same time, decide that it's not important because it was going to get fixed right away. Mr. Neuhalfen then said that he has always had pain in his upper back and shoulders, but never low back pain that "has caused me to have to urinate frequently [and] cause me pain down through my legs." ... He said he didn't have daily pain before. Neither is true. The record shows that Mr. Neuhalfen has a long history of radicular pain down both legs and his pain has been chronic. In the end, Mr. Neuhalfen admitted that he had preexisting low back problems, but he could not explain why he failed to disclose it on the claim form: "I don't know why I didn't put it in." ...

15. On September 13, 2006, Mr. Neuhalfen saw Dr. Steven Kraljiic regarding his low back pain. Dr. Kraljicc [sic] noted that an MRI showed degenerative changes in the lower lumbar at L5–S1 with diminished disc space height and a bulging disc. Dr. Kraljiic discussed "the natural history of his disease and the fact that he may have discogenic pain as a contribution to his overall condition." ...

16. On September 25, 2006, Dr. Gregory Peterson reviewed Mr. Neuhalfen's claim for WSI. He concluded that Mr. Neuhalfen had chronic neck and low back pain and memory complaints after his motor vehicle accident in December 1993, including prior complaints of low back pain radiating into his left leg. Dr. Peterson opined that Mr. Neuhalfen's spine condition was preexisting and his work merely triggered his symptoms.

. . . .

[¶ 18] In its final order, WSI found the greater weight of the evidence shows that Neuhalfen had a long history of low back pain commencing with his motor vehicle accident in 1993, that Neuhalfen made intentional false statements regarding the absence of any prior treatment for low back pain, and that Neuhalfen's false statements were "material" to WSI's determination of liability. WSI concluded that Neuhalfen intentionally misrepresented his prior history of low back pain, and WSI was therefore prevented from accurately assessing its liability for his claim, causing WSI to pay benefits in error.

[¶ 19] Neuhalfen's medical records indicate extensive prior medical treatment, replete with reports of low back pain. There is evidence that Neuhalfen willfully made false statements consisting of both omissions and denials of problems or treatment related to his low back in his March 30, 2006, first report of injury; during the July 19, 2006, "three-point contact" with a claims adjuster; and during a recorded July 28, 2006, meeting with his claims adjuster. Furthermore, during a September 2006 interview with two WSI investigators from its special investigations unit, Neuhalfen admitted to having preexisting low back pain before his March ·2006 work injury, but attempted to explain his selective omissions and denials.

[¶ 20] Based upon our review of the record, we agree that a reasoning mind reasonably could conclude Neuhalfen willfully made false statements that were sufficiently "material" to justify WSI's forfeiture of future benefits related to Neuhalfen's claim because Neuhalfen's statements "could have misled" WSI or its medical experts in deciding his claim. We therefore affirm WSI's decision regarding future benefits.

## B

■ [¶ 21] For Neuhalfen's willful false statements to be sufficiently "material" under N.D.C.C. § 65–05–33 to require reimbursement of the benefits paid, WSI must prove a causal connection between the willful false statements and the payment of the benefits. *See Fettig,* 2007 ND 23, ¶ 13, 728 N.W.2d 301.

[¶ 22] In its final order, WSI found that the greater weight of the evidence shows that Neuhalfen's false statements were material to WSI's determination of liability and caused WSI to pay benefits in error. WSI found that Neuhalfen's false statements were designed to prevent WSI from considering his prior low back problem when assessing the compensability of his current symptoms, thus precluding WSI from considering the compensability of Neuhalfen's claim with full knowledge of the facts. After WSI obtained some medical records and became aware that Neuhalfen had been treated for low back pain prior to his work injury, it asked Dr. Peterson to review the claim. In September 2006, after more records were obtained, Dr. Peterson reviewed Neuhalfen's file and determined that the claim was not compensable because Neuhalfen's medical history showed that the work injury was only a "trigger" of his preexisting low back symptoms. WSI found that at the hearing, Dr. Peterson confirmed that "but for" Neuhalfen's false statements WSI would not have accepted the claim. Neuhalfen's claims adjuster also testified that WSI would not have accepted the claim had it been aware of Neuhalfen's preexisting low back condition.

[¶ 23] WSI rejected Neuhalfen's argument that his failure to disclose his preexisting low back condition was not material because WSI knew of his 1993 motor vehicle accident. WSI found it did not have knowledge of the accident until after it accepted the claim. WSI also found that, in the claim adjuster's meeting with Neuhalfen on July 28, 2006, while Neuhalfen discussed the motor vehicle accident, he again failed to mention his prior low back pain resulting from the accident. WSI found that since Neuhalfen "specifically denied any such prior history by intentionally omitting it, even while he specifically identified other injuries caused by the motor vehicle accident," WSI did not have notice of Neuhalfen's pertinent preexisting low back condition. WSI found Neuhalfen's selective omission was material because it prevented WSI from accurately accessing its liability for benefits. WSI

found that had Neuhalfen disclosed his preexisting low back condition, "WSI would have taken some time to assess its liability for benefits" and that "WSI had no reason to doubt Mr. Neuhalfen's misstatements and [thus] awarded benefits without knowledge of their falsity."

[¶ 24]   In its final order, WSI also specifically rejected Neuhalfen's argument that his failure to disclose his prior low back condition is immaterial because he now has a herniated disc. WSI found it was not clear whether Neuhalfen has a herniated disc, but even if he does, Neuhalfen "specifically admitted having a herniated disc on January 4, 2000, before his work injury." WSI relied on chiropractic records which included a chiropractic intake form dated January 4, 2000, which contained boxes to check prior maladies, and on which "Herniated Disk" was checked "Yes." Although Neuhalfen testified at the hearing that his wife filled out the intake form for him, WSI found that this record constituted an admission. There is also evidence found in the records of a possible herniated disc from September 2004 and indicating Neuhalfen was told about "disc symptoms" and treatment of the low back pain "as though it is a disc herniation," in addition to medical records from September and October 2004, diagnosing muscle sprain and possible degenerative disc disease. Although Dr. Peterson did concede in testimony, that there is no objective medical evidence in the record of a disc herniation or bulge, which was revealed in the July 2006 lumbar MRI scan, before the work injury on March 30, 2006, Dr. Peterson opined that Neuhalfen's condition would not be compensable.

[¶ 25]   Regarding the July 2006 lumbar MRI scan, Dr. Peterson confirmed in his testimony that the radiologist interpreted the MRI to be a disc herniation, and that Neuhalfen's treating neurosurgeon subsequently interpreted it be a bulge. Dr.

Peterson testified, however, that "[i]n terms of what [he] can tell, [Neuhalfen's] got degenerative disc disease, he may have a bulging disc or herniated disc in his low back, I don't know which, but it seems like that's the most likely cause for his symptoms." WSI found that Dr. Peterson testified bulging discs most often cause radiculopathy, and a 1993 x-ray of Neuhalfen's low back is not inconsistent with the later MRI done in July 2006. WSI found "whether the disc is bulging or herniated, it still can cause nerve pain."

[¶ 26]   In his testimony, Dr. Peterson rejected that the July 2006 MRI, showing either a disc herniation or at least a bulging disc, represented a significant worsening of the severity or acceleration of Neuhalfen's prior low back problems, stating:

My response would be that the changes on the MRI are unlike[ly] the result of the incident just because of the nature of disc herniations and disc bulges, and herniations are rarely caused by acute trauma. That would be my initial answer. The second part of the answer is we don't know from looking over the records how this MRI finding indeed relates to the nature of Mr. Neuhalfen's symptoms.... And the third thing is ... going back to ... my original intent in addressing that was to determine whether or not this was an injury or a trigger, and ... my contention is that the MRI findings don't represent anything different than you would expect as a natural part of Mr. Neuhalfen's aging with the kind of spine that he has.

WSI found that the low back pain symptoms that Neuhalfen experienced after his work incident were the same "pain with radiation that he has complained of since [his 1993 motor vehicle] accident." In its final order, WSI ultimately concluded:

The greater weight of the evidence shows that Mr. Neuhalfen intentionally misrepresented his prior history of low

back pain. Mr. Neuhalfen's false statement that he had prior problems with this "upper back, not lower" could, and did, prevent WSI from accurately assessing its liability from Mr. Neuhalfen's claimed work injury and cause WSI to pay benefits in error. Dr. Peterson testified that Mr. Neuhalfen would not have been paid benefits if he had been truthful about his prior existing low back condition because his symptoms were merely triggered by his work injury and his low back pain was not work related. Mr. Neuhalfen's false statements clearly impeded WSI's process of determining eligibility for benefits and lead to WSI paying benefits for a preexisting low back condition that was caused by a motor vehicle accident. Accordingly, Mr. Neuhalfen shall forfeit any additional benefits relative to his injury and he is required to reimburse WSI for benefits paid based upon his false statements.

[¶ 27] As discussed, the record is replete with Neuhalfen's prior long history of low back pain and treatment. Based upon the testimony of the claims adjuster and Dr. Peterson, WSI found Neuhalfen's willful false statements substantially affected WSI's evaluation of his claim with regard to compensability. Although we may have disagreed with WSI's determination as to whether or not Neuhalfen had a compensable claim, this Court will not reweigh the evidence. *See Bergum v. North Dakota Workforce Safety & Ins.*, 2009 ND 52, ¶ 24, 764 N.W.2d 178; *Thompson v. Workforce Safety & Ins.*, 2006 ND 69, ¶ 11, 712 N.W.2d 309. Here, there is substantial evidence in the record about Neuhalfen's prior complaints and treatment for low back pain. Even if Neuhalfen was unaware of potential degenerative disc disease or disc herniation, the record reflects Neuhalfen was aware of his preexisting low back condition and his own obfuscation regarding this low back condition impeded

WSI from making a compensability determination when Neuhalfen initially filed his claim.

[¶ 28] We hold that the evidence supports WSI's finding that Neuhalfen's willful false statements were sufficiently material supporting both the forfeiture of future benefits and the reimbursement of benefits paid. We conclude that a reasoning mind reasonably could have found Neuhalfen's willful false statements actually caused the benefits to be paid in error. We therefore affirm WSI's final order.

## IV

[¶ 29] We affirm the district court judgment affirming WSI's final order.

[¶ 30] GERALD W. VANDE WALLE, C.J., DALE V. SANDSTROM, MARY MUEHLEN, MARING, JJ., and JOHN C. McCLINTOCK, D.J.,

[¶ 31] The Honorable JOHN C. McCLINTOCK, D.J., sitting in place of CROTHERS, J., disqualified.